11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Sherrod
Dewayne Scott

Appellant

Vs.                   No. 11-03-00338-CR -- Appeal from Harris County

State
of Texas

Appellee

 

Sherrod Dewayne Scott was charged with murder.  The jury convicted him of aggravated assault,
found that a deadly weapon was used, and assessed his punishment at confinement
for 15 years.  We modify the judgment and
affirm.

                                                                 Issues
on Appeal

Appellant has briefed five points of error.  In his first and second points, appellant
contends that the evidence is both legally and factually insufficient to
support the conviction.  In his third
point, appellant argues that he was denied a fair trial and due process of law
when the trial court limited his cross-examination of Friendswood Police
Detective Michael Cordero.  Appellant
contends in his fourth point that the instruction on the law of parties was not
raised by the evidence.  Finally,
appellant argues that the trial court abused its discretion by failing to
discharge the jury when it became hopelessly deadlocked.

                                                          Sufficiency
of the Evidence

A. Standards of Review








In order to determine if the evidence is legally
sufficient, we must review all of the evidence in the light most favorable to
the verdict and determine whether any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307
(1979); Jackson v. State, 17 S.W.3d 664 (Tex.Cr.App.2000).  In order to determine if the evidence is
factually sufficient, we must review all of the evidence in a neutral light and
determine whether the evidence supporting guilt is so weak that the verdict is
clearly wrong and manifestly unjust or whether the evidence contrary to the
verdict is so strong that the beyond-a-reasonable-doubt burden of proof could
not have been met.  Zuniga v. State,
144 S.W.3d 477 (Tex.Cr.App.2004);  Ross v. State, 133 S.W.3d 618
(Tex.Cr.App.2004); Vasquez v. State, 67 S.W.3d 229, 236
(Tex.Cr.App.2002); Cain v. State, 958 S.W.2d 404 (Tex.Cr.App.1997); Clewis
v. State, 922 S.W.2d 126 (Tex.Cr.App.1996).

We review the fact finder=s
weighing of the evidence and cannot substitute our judgment for that of the
fact finder.  Cain v. State, supra;
Clewis v. State, supra.  Due
deference must be given to the fact finder=s
determination, particularly concerning the weight and credibility of the
evidence. Johnson v. State,23 S.W.3d 1 (Tex.Cr.App.2000); Jones v.
State, 944 S.W.2d 642 (Tex.Cr.App. 1996), cert. den=d, 522 U.S. 832 (1997).  The jury, as the finder of fact, is the judge
of the weight and credibility of the witnesses=
testimony.  TEX. CODE CRIM. PRO. ANN.
arts. 36.13 & 38.04 (Vernon 1979 & 1981). This court has the authority
to disagree with the fact finder=s
determination Aonly when
the record clearly indicates such a step is necessary to arrest the occurrence
of a manifest injustice.@
 Johnson v. State, supra at 9.

                                                            B.  Evidence Presented

It is undisputed that Jarrad ACurtis@
White, the 22-year-old victim, died as a result of a single blunt force injury
to the back of his head.  It is further
undisputed that the injury occurred during a confrontation involving the victim
and his girlfriend=s older
brother on one side and Antoine Adams, Cameron Guina, and appellant on the
other.  What is disputed is who struck
the victim.

Krysta Hext testified that the victim was her
boyfriend and that she was 17 at the time of his death.  The victim, Hext, and four other girls were
on their way to a party at the beach when they stopped at Bobby Dean=s house to buy some Xanax.  The victim, Hext, and two of the other girls
had money to purchase the pills.  They
bought 12 pills for $40.  After they
drove off, they realized that Dean had only given them nine pills.

When they went back to Dean=s
house, Dean had gone inside, and Adams was outside shooting a basketball.  Dean came outside and gave them the other
three pills.  One of the girls in the car
got into a fight with Dean=s
girlfriend.  The two were punching each
other.  Dean and Adams ran over to
separate the girls; the victim did not. 
Hext stated that she went inside with Dean=s
girlfriend and asked her to stay inside. 
Hext said that she told Dean=s
girlfriend that they had not Acome
over to do all this.@








Hext testified that, when she came out of Dean=s house, Dean and the victim were
arguing.  No blows were exchanged.  Some other guys joined in the argument.  Hext testified that neither  Guina nor appellant were there.  Hext got in between Dean and the victim and
told them, AHey, we
are leaving.@  A guy named Derrick hit her in the face as
she got into the car.  Hext pushed him
away and got out of the car.  Derrick ran
and got a baseball bat.  He hit the car
and broke a window.  They drove off
before he could break any more windows.

Hext testified that they drove to Fancy Food Store
(a convenience store) where she called her mother.  Then, they went to her home.

At her home, they told her brother Kyle Oates
about what had happened.  Oates and the
victim became mad and were looking for a car to Ago
back over there.@  No one would give them car keys, and Oates
and the victim finally left on foot. 
Hext=s mother
drove off after them, and they all returned after about 10 or 20 minutes.  Oates and the victim Akind
of calmed down@ and
stayed at the home for about 30 or 45 minutes. 
Hext testified that, when she went to use the restroom, Oates and the
victim left.  Hext=s
mother called the Friendswood Police who told her to meet them at the Fancy
Food Store.  They saw Oates and the
victim near Fancy Food, and they met one police officer at the store.

Oates testified that he and his fiancée had gone
over to his mother=s house
around 4:30 p.m.  The victim and Oates=s sister left about 6:00 p.m.  Oates=s
mom answered the phone a little while later and became Ahysterical.@ 
Oates heard his mother ask, A[W]ho
hit you?@  He grabbed the phone from his mother and
heard his little sister say that someone had hit her and beaten the car with a
baseball bat.  A few minutes later, his
sister came home.

Oates stated that Hext had a bruise on her
face.  The victim was mad.  Oates said that he became upset as his sister
was telling what had happened.  He and
the victim left on foot to go to Dean=s
house.  They stopped at the Fancy Food
Store.  At this time, neither Oates nor
the victim were armed.  They saw Adams,
and the victim started talking to Adams. 
The victim was upset and asked Adams, AWhat
is up with your friends?@  When Adams responded that he did not have
anything to do with it, the victim Aopen-handed
like shoved [Adams=s] face.@ 
Adams ran off, and the victim and Oates went back to Oates=s mother=s
house.








When they left Oates=s
mother=s house
the second time, the victim and Oates took hammers from the garage.  The victim took a claw hammer, and Oates took
a hatchet hammer.  They put the hammers
in a pocket in their pants.  They walked
past the Fancy Food Store and down toward an elementary school.  As a car approached them, the driver Aslammed 
the brakes@ and
locked up the wheels.  Adams, Guina, and
appellant were passengers in the car. 
Appellant jumped out of the car. Oates testified that, as appellant was
approaching them, appellant saw the hammers in their pockets and got back in
the car.  The car drove off and then
returned a few minutes later.

This time, Adams, Guina, and appellant jumped out
of the car.  Oates testified that
appellant had what looked like a cane in his hand.  Guina had something wrapped around his hand.  Oates did not see anything in Adams=s hands.  Oates testified that he heard the three say
things like ANow what?@ and ALet=s do this.@  The victim and Oates ran; Adams, Guina, and
appellant chased them.  The victim and
Oates ran along a drainage ditch, through a hole in a fence, and into an apartment
complex.

Oates testified that he saw the victim throw his
hammer down and put his hands up.  He saw
first Guina, then appellant, and finally Adams approach the victim.  Guina immediately picked up the victim=s hammer.  Oates walked up, and Guina told him to drop
his hammer.  Oates did.  Words were exchanged.  Oates testified that he was saying things
like ASomebody
hit my sister,@ AWe don=t
have anything with y=all,@ and AHey,
calm down, we don=t want
trouble, we are sorry.@  Adams started Adoing
this stuff in front of [the victim=s]
face...kind of bowing up to him.@  Adams was acting like a boxer and acting A[l]ike he was about to hit him.@ 
The victim had his hands up and was saying, AI
don=t want any trouble, we are sorry.@ 
Appellant came up and put the victim and Oates Aup
against@ the
fence.  Appellant asked Oates for his
wallet, and Oates told him Ato
go screw himself.@  Appellant swung his cane at Oates.  It was a dark, cherry-wood-type cane with a
brass ring.  Oates ducked, and the cane
hit him on the back of his head. 
Something hit Oates on the foot. 
Oates tripped and fell.








When he stood up, Oates saw that Adams, Guina, and
appellant had Aswarmed@ the victim.  Oates testified that he saw appellant hit the
victim in the head with the cane.  The
victim Apretty
much just dropped real quick.@  Oates grabbed one of the guys and tried to
pull him off of the victim.  First,
appellant ran.  Then, Guina ran followed
by Adams.  Oates followed them and saw
them throw or drop what they had been carrying in their hands in the
ditch.  Oates ran out of breath, stopped
chasing them, and returned to the victim.

A Akid@ in his early twenties was standing
over the victim who was on his back. 
Oates picked up the victim.  The
victim=s eyes
were open.  He was Akind of blinking@
and was looking at the sky.  The victim
was hyperventilating.  Oates knew that
the victim was hurt.  While he saw Aa lot of blood,@
Oates could not tell where the victim was injured.  The victim did not communicate with him.

On cross-examination, Oates testified that he had
been mistaken in his first statement to the police when he said that appellant
had had a baseball bat.  He further
testified that he saw appellant hit the victim in the head with the cane.

John Elliott testified that he was out on his
apartment balcony smoking a cigarette when he heard Ayelling
and screaming.@  Elliott saw Aa
guy...backing up@ toward
the fence with his fists up and Athree
other gentlemen were chasing him.@  Elliott heard someone say, ADon=t
be f-ing with my sister.@  When all three of the men reached the victim,
Elliott saw two of the men hit him.  The
victim was in a defensive position.  One
man had what looked like a claw hammer; the other man had an object that was
three or three and half feet long and looked like a bat or a stick.  When the bat-like or stick-like object hit
the victim=s head,
it sounded like a glass bottle was breaking over the victim=s head. 
The victim fell to the ground, and the three men ran off.  Elliott saw Oates chase the three and then
return.

Elliott went downstairs to check on the
victim.  The victim was on his back.  He was bloody, and he was shaking.  Elliott tried to talk to the victim, but the
victim did not say anything.

Adams testified that he was 16 years old at the
time of trial.  Adams stated that he had
been charged with the murder of the victim and had been certified to be tried
as an adult.  Adams had entered into a
deal with the State where, in exchange for his testimony, the State would
reduce the charges to aggravated assault. 
At the time of the trial, Adams had entered his plea of guilty and was
waiting to be sentenced.








Adams stated that he had gone to Dean=s house and was outside shooting hoops
when Hext, the victim, and some girls came over to buy Xanax from Dean.  They left without counting the pills and
returned when they discovered that Dean had shortchanged them three pills.  One of the girls began arguing with
Dean.  The girl pushed Dean in the chest,
and Dean=s
girlfriend started to fight her.  Adams
broke up the fight.  Hext was screaming,
and the victim was just standing there. 
Derrick Jones was the person who Afronted@ Dean the Xanax, and he asked who was Amessing with his partner.@ 
Adams pointed toward the victim, and the victim pulled a knife.  Adams testified that Derrick and the victim
got out in the middle of the street and Asquared
up.@ 
There was Aa whole
bunch of screaming going on,@
and Adams left on foot.

Later on, Adams saw the victim and Hext=s brother at the Fancy Food Store.  The victim asked him, AWhere
your homeboys at now?@  Adams answered, AThey
at the house.@  Hext=s
brother then grabbed him, and the victim hit him in the jaw.  Adams Agot
loose@ and ran
home.

Guina, Guina=s
girlfriend, and appellant were at Adams=s
house when he got home.  Adams was
holding his jaw when he walked in.  He
told them that he Agot
jumped by two boys.@  Guina wanted to go back and find the
guys.  At first, Adams said no.  Later, Adams agreed, and they all left in
Guina=s
girlfriend=s
car.  Guina=s
girlfriend drove.

They saw the victim and Oates near the elementary
school and pulled over.  Adams testified
that he hopped out of the car and asked, AWhat=s up now?@  Appellant and Guina also got out of the
car.  When Oates and the victim pulled
out their weapons (the hatchet and hammer), all three of them got back in the
car; and Guina=s
girlfriend drove away.  They went to the
school parking lot where Adams grabbed a leatherman=s
tool.  They drove back to where the
victim and Oates were.  All three of them
jumped out of the car and chased the victim and Oates.  Adams testified that he was the first out of
the car.

Adams chased the victim and Oates down the ditch
and through a hole in the fence.  The
victim and Oates separated.  The victim
was leaning over breathing hard when Adams reached him.  The victim Apopped@ up, and Adams hit him three or four
times.  Adams did not remember the victim
having anything in his hands at this time. 
Guina was right behind Adams and was swinging a set of jumper cables at
Oates.








The victim bent over after Adams hit him.  Adams saw appellant raise his cane in the
air.  The cane had a bird on the end of
it.  Appellant hit the victim in the back
of his head with the cane hard enough that it sounded like glass breaking.  The victim looked up and then fell face down.
Blood Awent
everywhere.@  The victim=s
blood splattered on Adams and on the fence. 
The victim did not get back up. 
Adams testified that he screamed, AWhy
you do it?@

Appellant ran through the hole in the fence
first.  He still had the cane in his
hand.  Guina went through the fence next
with the jumper cables, and Adams followed. 
They ran back through the ditch toward the car.  When they reached the car, Guina still had
the jumper cables; but appellant did not have the cane.  Adams testified that he had dropped the
leatherman=s tool
somewhere between the ditch and the fence line.

Adams stated that Guina and Guina=s girlfriend dropped him off at his
house and that he fell asleep.  About
3:30 or 4:00 a.m., the police came and arrested him.  When Adams came home later that morning,
appellant asked him if he had told the police anything.  Adams said no.  Adams testified that appellant then said, AMan, I didn=t
mean to kill him@ and AI didn=t
know I killed him.@ 

 On
cross-examination, Adams testified that he was mad at the victim for hitting
him, that he wanted a Aone-on-one@ with the victim, and that Guina and
appellant were coming along to keep Oates away. 
He also stated that a leatherman=s
tool was something like a Swiss Army knife and that he had seen it inside Guina=s girlfriend=s
car.

Friendswood Police Detective Michael Cordero
arrived at the scene after the victim had been transported.  There was Aa
massive amount of blood in one area.@  Detective Cordero found a leatherman buck
tool with the knife extended in a grassy area near the fence.  He also found a claw hammer and a cane in the
ditch.  Most of the cane was submerged in
Amud/water.@  Ten days later, a hatchet and the top of the
cane B the
brass bird=s head B were found in the ditch.  The hatchet was embedded in the mud, and the
brass bird=s head
was under about two foot of water.

Dr. Morna Gonsoulin, M.D., testified that she was
the assistant medical examiner who performed the autopsy on the victim.  The victim had a large wound to the back of
his head where his skull had been fractured and fragments of his skull had
lodged in his brain causing bleeding. 
His injury was consistent with being hit in the head with a cane topped
with a metal bird head, a claw hammer, or a hatchet.  Dr. Gonsoulin testified that the weapon used
had a handle and was capable of penetrating the skull.  The victim also suffered abrasions on his
face, elbow, and thumb; bruises at the base of his neck, near his armpit, on
his foot, and on his upper arms; and a Abusted@ lip. 
The cause of death was the blunt force injury to the back of his head.








Friendswood Criminal Investigator Eric Price
testified that, when he went to arrest appellant, appellant was Akind of leaving [through] one of the
rear windows@ as
Investigator Price was Atrying
to go in the front door.@  Investigator Price took appellant=s statement in which appellant said
that he heard the cane break when Guina hit the victim with it.  Appellant=s
statement was read to the jury.

Appellant testified that, at the time of the
incident, he had been staying with Adams and Adams=s
mother.  Appellant stated that he was
watching Adams=s younger
siblings for Adams=s
mother.  Guina and his girlfriend came
over.  Adams was not home at the
time.  Appellant stated that, out of
respect for Adams=s mother
and because there were younger children in the house, they went into the
backyard to smoke marihuana.  Adams came
home and told them that he had been Ajumped.@

When Guina asked if Adams wanted to go back and
get them, Adams answered, AYeah.@ Guina, Adams, and appellant rode in
the car while Guina=s
girlfriend drove.  When they saw the
victim and Oates, Adams and appellant got out of the car.  Adams asked them why they jumped him.  The victim and Oates pulled out their
weapons, and Adams and appellant got back into the car.

Appellant testified that Guina told his girlfriend
to drive around the corner.  Guina opened
the trunk and took out a knife and cane. 
He gave the knife to Adams and the cane to appellant. Guina did not have
a weapon.  They drove back to find the
victim and Oates.

They found the victim and Oates, and they got out
of the car and chased them.  Adams asked
the victim why he jumped him.  The victim
put his hammer down on the ground, put his hands up in a defensive blocking
motion, and said, AI don=t want to do nothing.@ 
Adams ran up and started hitting the victim with his fists.  Oates came up and dropped his hammer.  Guina picked up Oates=s
hammer.  Appellant still had the cane in
his hands and asked Oates for his wallet. 
Oates refused and ran off. 
Appellant stated that he took off after Oates.  He swung and hit Oates with the cane.  Oates fell, and the cane broke when it hit
the ground.








Appellant testified that his back was turned to
the victim and Guina and that he did not see what happened.  Appellant stated that he did not hit the
victim with the cane.  After the victim
was on the ground, appellant ran.  He had
both the cane and the brass bird head top of the cane.  Appellant stuck the brass bird head and the
cane in the mud in the ditch when he tried to catch his balance as he was
running.

Appellant testified that he was not sure why he
asked Oates for his wallet or why he picked up the brass bird head after it
broke off of the cane.  Appellant was not
sure why he even swung his cane at Oates. 
He thought that Adams and Guina carried the hammers away from the scene.
Appellant also testified that there was no plan or conspiracy between Guina,
Adams, and himself to hurt or kill anyone.

                                                                     C.
Analysis

Appellant argues that the evidence is insufficient
to establish either that he hit the victim with the cane or that he was
involved as a party to the offense.  We
disagree.

While appellant adamantly denied hitting the
victim with the cane and stated that Guina struck the victim, Oates and Adams
repeatedly testified that they saw appellant hit the victim in the back of his
head with the cane, that appellant was the only one to hit the victim with the
cane, and that only appellant had the cane during the confrontation.  Elliott saw the incident from his second
story apartment balcony and did not know any of 
the people involved.  Elliott
testified that he saw Adams and appellant with weapons:  one had a hammer, the other had the bat-like
or stick-like object.  Elliott testified
that either Adams or appellant struck the victim with the bat-like or
stick-like object and that Guina did not strike the victim with the
object.  Adams and Elliott testified
that, when the cane or stick-like object hit the victim=s
head, it sounded like glass breaking.

It is undisputed that Guina, Adams, and appellant
left together, that they rode around together looking for Oates and the victim,
that they found Oates and the victim, that they left and retrieved a cane and a
leatherman=s tool or
knife, that they searched and found Oates and the victim a second time, that
they got out of the car and together chased Oates and the victim, and that they
confronted Oates and the victim near Elliott=s
apartment.  Both appellant and Adams
testified that there was no expressed agreement to act together.  However, through his behavior, appellant
encouraged, directed, aided, or attempted to aid in the commission of the
offense.  TEX. PEN. CODE ANN. '' 7.01 & 7.02 (Vernon 2003).








A rational fact finder could have found the
essential elements of the offense of aggravated assault.  The evidence is legally sufficient.  When all the evidence is reviewed in a
neutral light, we find that the evidence supporting guilt is not so weak that
the verdict is clearly wrong and unjust and that the evidence contrary to the
verdict is not so strong that the beyond-a-reasonable-doubt standard could not
have been met. The evidence is factually sufficient.  The first and second points are overruled.

                                               Cross-examination
of Detective Cordero

At the conclusion of the cross-examination of
Detective Cordero, the following occurred:

Q: Okay. 
Now, at some point, Antoine Adams had bragged that he had killed Jarrad
White, didn=t he?

 

[PROSECUTOR]: Objection to hearsay, Your Honor.

 

THE COURT: Sustained.

 

[DEFENSE COUNSEL]: May we approach, Your Honor?

 

THE COURT: Yes.

 

(At the Bench, on the record)

 

THE COURT: Unless this witness was sworn for that
to take place --

 

[DEFENSE COUNSEL]: I thought it was an exception
to the hearsay rule.  It=s a declaration against interest, Your
Honor.

 

THE COURT: If this witness heard that.

 

[DEFENSE COUNSEL]: Well, actually, the material
that I was given indicated that this witness took a statement from someone that
Antoine Adams had told that.

 

[PROSECUTOR]: That is double hearsay.

 

THE COURT: That=s
not going to work.

 

[DEFENSE COUNSEL]: It=s
not hearsay to him.

 

THE COURT: I am going to sustain the objection

 

[DEFENSE COUNSEL]: I was trying to give you a
clarification on why I thought it was an exception.








 

THE COURT: Not with this witness.

 

(Open court, defendant and jury present)

 

[DEFENSE COUNSEL]: I pass the witness, Your Honor.

 

THE COURT: [PROSECUTOR]

 

[PROSECUTOR]: Nothing further.

 

THE COURT: You may step down, sir.

 

Later, when appellant called Detective
Cordero as a witness, the following occurred:

Q: Officer Cordero, I want to ask you one
question.  Back on November 8th of 2002,
did you interview a young man, a juvenile named Chad Campbell?

 

A: Yes, sir, I did.

 

[DEFENSE COUNSEL]: No further questions.

 

Appellant argues on appeal that the trial court erred in limiting
his cross-examination because Adams=s
statement was admissible under TEX.R.EVID. 803(24) as a statement against
interest.  The State contends that
appellant has waived any complaint because an offer of proof was not made.  We agree.

The record before this court is silent concerning
what statement, if any, was made about Adams bragging that he had killed the
victim.  Therefore, the complaint has not
been preserved for appellate review. 
TEX.R.APP.P. 33.1 & 33.2.  The
third point is overruled.

                                                       Court=s Charge

Appellant was indicted for murder.  During the trial, the State explored several
theories of how the offense occurred, including a conspiracy theory.  At the charge conference, the trial court
stated that it was going to Atake
out self defense@ and  Athe
regular law of parties.@  After some discussion, the trial court
decided to Aleave in
the law of parties, leave in conspiracy, [and] take out self defense.@ 
Appellant objected to the inclusion of Athe
law of parties.@








In his fourth point, appellant complains that the
trial court erred by submitting a charge on the Aregular@ law of parties.  Appellant contends that the instruction was
not supported by the evidence and that its inclusion was a comment on the
weight of the evidence.  Therefore, the
trial court=s charge
violated TEX. CODE CRIM. PRO. ANN. art. 36.14 (Vernon Supp. 2004 - 2005) and
denied appellant a fair trial and due process of law.  We disagree.

The law of parties is defined by TEX. PEN. CODE
ANN. ' 7.01
(Vernon 2003) and provides:

 (a) A
person is criminally responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another for which he is
criminally responsible, or by both.

 

(b) Each party to an offense may be charged with
commission of the offense.

 

(c) All traditional distinctions between
accomplices and principals are abolished by this section, and each party to an
offense may be charged and convicted without alleging that he acted as a
principal or accomplice.

 

TEX. PEN. CODE ANN. '
7.02 (Vernon 2003) provides that a person is criminally responsible for the
conduct of another when he acts Awith
intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense.@ 

Appellant=s
argument that there was insufficient evidence that he acted as a party to the
offense has been discussed previously and rejected.   While both Adams and appellant testified
that there was no expressed agreement to act together, appellant encouraged,
directed, aided, or attempted to aid in the commission of the offense through
his behavior of looking for, pursuing, and confronting the victim.

The evidence supported the trial court=s charge.  Therefore, the trial court did not err; the
provisions of Article 36.14 were not violated; and appellant was not denied his
right to a fair trial and due process of law. 
The fourth point is overruled.

                                                                 Jury
Deliberations

In his fifth point, appellant contends that the
trial court abused its discretion by not discharging the jury pursuant to TEX.
CODE CRIM. PRO. ANN. art. 36.31 (Vernon 1981) when it was Ahopelessly deadlocked.@ 
We disagree.








The record before this court reflects that, after
almost three days of testimony, the jury began deliberating guilt/innocence at
3:00 p.m. on July 23, 2003.  The court
recessed for the day at 5:32 and reconvened the next morning at 8:40 a.m.  The jury deliberated until 12:40 p.m.  The jury resumed deliberations at 2:00 p.m.
and reached a verdict at 2:57 p.m.

During its deliberations, the jury sent out five
requests on the first day and one request on the second day.  The first day, the jury also sent out a note
stating that it was deadlocked.  The
trial court responded with an Allen charge.[1]  Appellant objected and moved for a
mistrial.  The trial court overruled the
objection and denied the mistrial.

In the present case, the Allen charge did
not pressure the jury to reach a particular verdict and did not convey the
trial court=s opinion
of the case.  See Howard v. State,
941 S.W.2d 102, 125 (Tex.Cr.App.1996); Calicult v. State, 503 S.W.2d
574, 576 n.2 (Tex.Cr.App.1974); Arrevalo v. State, 489 S.W.2d 569
(Tex.Cr.App.1973); West v. State, 121 S.W.3d 95, 107-08 (Tex.App. - Fort
Worth 2003, pet=n ref=d). 
The record does not support appellant=s
claim that the trial court abused its discretion.  The fifth point is overruled.

                                                           Modification
of Judgment

While the record reflects that the jury convicted
appellant of aggravated assault, the judgment states the offense as
murder.  The judgment is modified to
reflect that appellant was convicted of the offense of aggravated assault.

                                                                This
Court=s Ruling

As modified, the judgment of the trial court is
affirmed.

 

TERRY McCALL

JUSTICE

 

April 14, 2005

Do not publish.  See
TEX.R.APP.P. 47.2(b).

Panel
consists of:  Arnot, C.J., and

Wright,
J., and McCall, J.











[1]Allen v. United States, 164 U.S. 492 (1896).